Valdhe F. PITMAN, Plaintif In Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–14551.

Court of Criminal Appeals of Oklahoma.

April 28, 1971.

Rehearing Denied May 25, 1971.

Second Rehearing Denied Aug. 11, 1971.

Joe Cannon and Valdhe F. Pitman, Oklahoma City, for plaintiff in error.

Curtis P. Harris, Dist. Atty., James R. McKinney, Asst. Dist. Atty., Oklahoma County, for defendant in error.

CARLE, Special Judge.

This is an appeal by the Plaintiff in Error, hereinafter called Defendant from a conviction of the crime of perjury in the District Court of Oklahoma County, wherein he received a sentence of of one (1) year in the State Penitentiary, which was suspended.

It appears that the Defendant was a practicing Attorney in Oklahoma City and apparently involved to a large extent in defending persons charged with crimes. He had in his employ one E. W. "Jeep" O'Neal. On July 31, 1963, the Defendant and O'Neal entered into the following Memorandum Agreement:

### "MEMORANDUM AGREEMENT

"This Memorandum Agreement, made and entered into this 31st day of July 1963, between Valdhe F. Pitman, hereinafter referred to as party of the first part, and E. W. O'Neal, hereinafter referred to as party of the second part, WITNESSETH:

"Whereas, party of the Second part is and has been a salaried employee of party of the first part, and,

"Whereas, parties hereto desire to enter into a new agreement as and for compensation of party of the second part on relation to party of the first part.

"Now, therefore, for and in consideration of the mutual promises and agreements of the parties, it is hereby agreed as follows:

"1. Salary of second party shall cease upon the execution of this agreement; however, second party shall continue working for first party as before, and in addition thereto shall make all bonds for first party on clients represented by first party, for the compensation hereinafter set forth.

"2. Fees for said bonds shall be at the rate of 10% of the bond amount, which cash fees shall be deposited in the Liberty National Bank and Trust Company of Oklahoma City and carried under the account name of "O'Neal Bail Bonds". Checks drawn on said account shall be honored when signed by first party singly, or by second party and countersigned by first party.

"3. Of said funds on deposit to the account of O'Neal Bail Bonds, 20% shall at all times be left in escrow in said account, or, as the parties shall agree, placed in a savings account in either the Liberty National Bank and Trust Company or the First National Bank and Trust Company, to insure against losses from bond forfeitures.

"4. Of the remaining 80%, second party shall receive 40% as and for salary compensation, and first party shall receive 40%, *it being understood and agreed that the properties used on said bonds are the properties of first party and are held in trust by second party.*

"5. In the event of bond forfeiture, same shall be paid from monies held in escrow and/or savings account; however, if sufficient monies are not available, second party shall be liable therefor; provided, however, that if at any time any forfeitures exceed the amount held in escrow in checking or savings account, then and in that event, the future escrow percentage shall be increased to 40% until such deficit has been covered and until the sum of $2500.00 be held in escrow over and above all forfeitures, and the parties shall be compensated commensurately with the increased escrow withheld.

"In witness whereof, the parties hereto have hereunto set their hands the day and year first above set forth.

/S/ Valdhe F. Pitman

Valdhe F. Pitman

Party of the First Part

"Witness:

/S/ Ruby Jewell Rodgers

/S/ E. W. O'Neal

E. W. O'Neal

Party of the Second Part"

(Emphasis Ours)

The Defendant was married to one Paula J. Wilde, sometime prior to September 3, 1963. This lady owned Lots 29 and 30 in Block 1, Bancroft Addition to Oklahoma City, Oklahoma. On August 21, 1963, the Defendant alone executed a Quit Claim Deed to E. W. O'Neal covering said Lots, which Deed was filed for record on August 21, 1963, in the office of the County Clerk of Oklahoma County.

On August 26, 1963, E. W. O'Neal executed a Bond in the Case of Oklahoma -vs- Freddie Garcia, No. 28808, in the District Court of Oklahoma County as surety for the Defendant in that case, and scheduled as security for said Bond, the above described Lots. The Defendant, Valdhe F. Pitman, was Attorney for Freddie Garcia.

On September 3, 1963, a Quit Claim Deed in favor of E. W. O'Neal was executed by Paula J. Wilde, one and the same person as Paula J. Pitman and her husband, Valdhe F. Pitman, which was filed for record in the office of the County Clerk on September 25, 1963.

O'Neal and his wife executed a Quit Claim Deed to the Defendant covering said property which bears the date of October 12, 1964. However, this Deed was not filed for record until January 15, 1965. In the meantime, and on January 4, 1965, the District Attorney of Oklahoma County filed an Application to Strengthen Bond, in State -vs- Garcia, and this application was heard before Judge William L. Fogg, on February 2, 1965.

The Defendant was called as a witness in the hearing on said Application and testified in part as follows:

"The Court: Now, the next one that I have listed there has to do with the forfeiture, 61–J; turn on through there, Mr. Pitman; 61–K, 61–I, 61–M, down to No. 88, and that is Lot 29 and 30, Block 1, Bancroft Addition, to Oklahoma City.

"A Which one is it you want to know about?

"The Court: 88, Exhibit No. 88, it's on down past those.

"A Oh, yes, State's Exhibit 88. You don't want to know anything about these you just read off?

"The Court: Sir?

"A You didn't want to know anything about these here, the judgments and the like?

"The Court: no.

"A Okay, State's Exhibit 88. Now, what was your question?

"The Court: What do you know about that property?

"A That is one of the pieces of property, Your Honor, that I signed over to Mr. O'Neal, *without any deed or anything for return. It was his property to do with as he saw fit, any way he saw fit.* That just happens to be a duplex apartment house and five room house on both of those.

"The Court: So, based on your knowledge, did Mr. O'Neal own that property at the time that bond was given?

"A *Yes, he certainly did.*"

(Emphasis ours)

The State alleges that the testimony underlined above by us was false and untrue and known by the Defendant to be false and untrue and was perjury.

In his brief the Defendant sets forth eleven Propositions of Error.

Under Proposition One, the Defendant urges that the Trial Court erred in overruling the Defendant's Demurrer to the Evidence of the State because it was not proved that the testimony given by the Defendant in the hearing on the Application to Strengthen Bonds was given under oath.

The testimony of Pitman apparently covered some 42 pages of typed transcript, from pages 28 through 70, and the statements upon which the charge of perjury was based were found on pages 49 and 50 of said transcript. The District Attorney offered in evidence the entire transcript, both direct and cross-examination, redirect and recross of the Defendant, and the Defendant objected to the admission of the entire transcribed testimony.

When the Court Reporter who transcribed the testimony was put on the witness stand, the Defendant's Attorneys entered into the following stipulations:

"Mr. Spivey: Not the whole record. We waive any identification now; now as to what they want to offer, we'll get to that when they offer it.

"The Court: Very well, you waive identification—

"Mr. Spivey: That's right.

"The Court: (continuing)—of the transcribed testimony of the witness, Valdhe Pitman.

"Mr. Spivey: Yes, sir.

"Mr. McKinney: May I ask you this: are you stipulating that this occurred in Oklahoma County, State of Oklahoma, in District Court?

"Mr. Spivey: In District Court.

"Mr. McKinney: Before Judge Fogg?

"Mr. Spivey: Before Judge Fogg. We will stipulate to that."

■ It appears to us that the defendant's attorney was stipulating that his client had on the 2nd day of February, 1965, before Judge Fogg given certain *testimony*. Testimony refers to a sworn statement given as evidence in a legal proceeding.

" 'Testimony' is a statement made under oath in legal proceedings or evidence of witness given under oath." Patterson v. State, 122 Ohio St. 96, 171 N.E. 26, 27.

" 'Testimony' embraces only the declarations of witnesses made under oath or affirmation." Wyoming Loan and Trust Company v. W. H. Holliday Company, 3 Wyo. 386, 24 P. 193.

■ By stipulating that the Defendant did testify, the Defendant stipulated that the evidence was given under oath and cannot now be heard to complain that the State failed to prove that the testimony was in fact under oath.

The Defendant's Second Proposition deals with the fact that the jury which tried the cause was chosen from a group of thirty-six (36) jurors drawn from the entire panel by the Presiding Judge of the multi-divisioned Court, which drawing was made outside the presence of the Defendant or his Attorneys and from which drawing they were actually excluded by the Court Clerk on instructions from the Presiding Judge. There is no contention that the names were drawn other than by the usual selection procedures in such cases.

■ The Defendant cites no authority to support his position and we think that the case of Fray v. State, 46 Okl.Cr. 260, 285 P. 142, adequately dispenses with this question. In that case we said:

"The district court of Tulsa county has four judges. Section 3083, Comp.Stat. 1921. All or any number of them may hold court at the same time. Section 3089, Comp.Stat.1921. One hundred and seven jurors of the panel selected for the term were qualified and in attendance upon the entire court composed of four judges. Sixty-one of this number were in attendance upon that division of the court presided over by the trial judge in this case. The others were either serving on juries in other divisions of the court or were in attendance upon some other divisions engaged in impaneling a jury. It is not contended that the sixty-one jurors assigned to this division were improperly selected or were disqualified by reason of the manner of their selection, but that, under section 2645, supra, the names of the persons impaneled to serve as jurors in the trial were not drawn from the entire venire. If this section is mandatory and was so construed, then only one Judge could avail himself of the services of a regular venire, and the other judges would have to impanel juries from open or special venires. See Johnson v. State, 16 Okl.Cr. 428, 183 P. 926. This certainly is not the meaning of the statute involved. In a county where more than one district court is sitting, the trial judge may impanel a jury from such part of the regular venire as is assigned to the division over which he presides. The purpose of the statute

is to prevent a hand-picked jury by arbitrarily selecting a portion of the venire from which to impanel a jury to the exclusion of other members of the venire. It is not claimed that this was done or attempted to be done in this instance. The right of an accused in the selection of a jury is one of exclusion of incompetent, biased, or prejudiced jurors, and not the inclusion of any particular persons. The excusing of members of the regular panel or a dividing of the panel for the convenience of the court, where more than one judge is sitting, is within the sound discretion of the court. The exercise of such discretion will not be disturbed, unless an abuse is shown. Mathews v. State, 19 Okl.Cr. 153, 198 P. 112."

We find that the procedure used in the District Court of Oklahoma County for empaneling jurors is not an abuse of discretion and did not deprive the Defendant of any due process of law.

In his third Proposition, the Defendant states that the Trial Court erred in overruling his Motion to Quash the Jury Panel, for the reason that the Order of the Presiding Judge of the District Court of Oklahoma County ordering certain jurors to report back for a third week of jury service was in violation of fundamental procedural due process.

The jury panel selected for the jury session at which the Defendant was tried, reported for duty on October 2, 1967, and would normally have terminated their service on October 15, 1967. The Trial Court ordered that the jury be held over for an extra six (6) days to complete the jury business of the term of Court and the Defendant's case was set for trial and tried on October 18, 1967.

38 Okla.Stat. Sec. 21, reads in part as follows:

" * * * No juror shall be allowed to serve more than two weeks at one term, unless at the end of such period, he is upon a panel engaged in the consideration of a case in which event he may be excused when such case is terminated; provided, that if the Judge is of the opinion that the jury business of a term of court may be concluded within six (6) days, he may require a jury, or a juror, to remain until the termination of said jury service, by entering an order to that effect upon the court's journal, and this provision shall apply to the District, Superior, Common Pleas and County Courts."

This Section has been amended since the trial of this case but the above wording was in effect at the time.

■ The Defendant contends that "term of Court" means the January and July terms of Court and not the two week jury term held in October of 1967. He further contends that the Court would hold additional jury sessions in November and December of 1967, and the Court was therefore not warranted in holding the jury an additional six (6) days because the jury business of the term of Court could go over until either the November or December dockets. Under this view, a jury could be held over only in the December session of the July term if more than one (1) jury docket was held during that term of Court. To agree with this view could very possibly hamper the administration of justice in our metropolitan areas where as many as six (6) jury dockets in one term of Court are held. Five (5) dockets would be limited to two (2) weeks, and one (1) docket to three (3) weeks.

■ We find that this argument is without merit. The term "term of Court" as used in the above context means the particular jury session for which a petit juror is called and not the January and July terms formerly set up by 20 O.S.1961, § 95. The identical question has been decided in Satchell v. State, Okl.Cr., 443 P.2d 125. In that case we held as follows:

"A challenge to the panel can be founded only on a material departure from the forms prescribed by law in respect to the drawing and return of the jury or on the intentional omission of the sheriff to

summon one or more of the jurors drawn from which the defendant has suffered material prejudice."

In this case we find that the Defendant was not materially prejudiced nor is the holding over of a jury for an additional six (6) days, even though the same District Court was to hold two (2) additional jury dockets during that term, a material departure from the forms prescribed by law.

■ In Proposition Four of Defendant's Brief, the Defendant contends that the State did not prove the necessary criminal intent or mens rea. He states that testimony to a fact which is not true but believed to be true by the one testifying is not perjury. This is no doubt true. However, it would be difficult to reconcile the obvious intent of the Memorandum Agreement between the Defendant and O'Neal, dated July 31, 1963, wherein it states that:

"* * * it being understood and agreed that the properties used on said bonds are the properties of First party and are held in trust by Second Party."

With defendant's testimony to the following effect:

"The Court: What do you know about that property?"

"A That is one of the pieces of property, Your Honor, that I signed over to Mr. O'Neal without any Deed or anything for return. It was his property to do with as he saw fit, anyway he saw fit. That just happens to be a duplex apartment house and five room house on both of those."

The sequence of events should be remembered at this point:

July 31, 1963, Memorandum Agreement between Defendant and O'Neal:

August 21, 1963, Deed from Defendant by himself to O'Neal (at this point title to the property was vested in Paula J. Wilde, Pitman's then wife) ;

August 26, 1963, (filed August 27, 1963) Bond made by O'Neal for Freddie Garcia, Defendant's Attorney wherein property in question was scheduled.

September 3, 1963 (filed September 25, 1963) Deed from Paula Jo Wilde (Pitman) and Mr. Valdhe F. Pitman to E. W. O'Neal;

October 12, 1964, Deed from O'Neal and wife, to Pitman, alone ;

January 4, 1965, Application to Strengthen Bond in State—vs—Garcia;

January 15, 1965, filing of record of Deed from O'Neal to Pitman, dated October 12, 1964;

February 2, 1965, Hearing on Application to Strengthen Bond before Judge Fogg.

The Defendant, a lawyer, could not have been simply mistaken as to the intent or the effect of the Memorandum Agreement when he testified that he had signed over the property to O'Neal "without any Deed or anything in return." Title to the property was not in the Defendant when he attempted to deed it to O'Neal. It was not in the Defendant or O'Neal when O'Neal made Garcia's bond. Under the terms of the Memorandum Agreement the property was not O'Neals, "to do with as he saw fit, anyway he saw fit." In point of fact, O'Neal reconveyed the property to Pitman before the Application to Strengthen Bond in the Garcia case was filed.

■ Under this set of facts we hold that the Defendant's Proposition Four is without basis.

In Proposition Five the Defendant complains that he was not afforded a fair and speedy trial as required by the Constitution of the State of Oklahoma. On July 13, 1965, the District Attorney of Oklahoma County filed three Informations against the Defendant, two for Subornation of Perjury and the present perjury charge. One of the Subornation of Perjury charges was tried to a jury on May 16, 1966, and again on October 18, 1966, and both trials resulted in hung juries. The present case was tried on October 18, 1967. The record does not indicate that there was any demand that the case be tried at an earlier date.

Okl.Const. Art. 2, Sec. 6 provides as follows:

"The Courts of justice of this State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay or prejudice."

Sec. 20 of the same article provides in part as follows:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed: * * *"

22 Okl.Stat. Sec. 812, provides in full as follows:

"If a defendant, prosecuted for a public offense, whose trial has not been postponed upon his application, is not brought to trial at the next term of court in which the indictment or information is triable after it is filed, the court must order the prosecution to be dismissed, unless good cause to the contrary be shown."

The above Statutory provision is a legislative construction of the Oklahoma Constitutional requirements of a speedy trial. This Statute has been construed many times by this Court. In Brummitt v. Higgins, Judge, 80 Okl.Cr. 183, 157 P.2d 922, this Court held as follows:

"It has been held that where the defendant is on bail the presumption is that the delay was caused by or with the consent of the defendant and the record must affirmatively show that he demanded a trial or resisted the continuance of the case. However, if the defendant is not on bail, the law makes the demand for him and the prosecution has the burden of showing that the trial was delayed for some lawful cause. State ex rel. Davis v. Bayless, 38 Okl.Cr. 129, 259 P. 606; Francis v. State, 26 Okl. Cr. 82, 221 P. 785; Bowes v. State, 7 Okl.Cr. 316, 126 P. 580."

In the case of Johnson v. District Court of Muskogee County, Okl.Cr., 413 P. 2d 914, we held:

"We have repeatedly held under 22 Okl. St.Ann. § 812, that person on bail and not in custody by virtue of a charge pending against him, must affirmatively show that he demanded a trial and resisted the continuance of the case from term to term, but when he has not demanded the trial and resisted continuances, he is not entitled to a dismissal of the charge. See Harris, et al., v. Ogden, District Judge, 44 Okl.Cr. 418, 281 P. 316; Brooks v. District Court of Oklahoma County, 408 P.2d 562."

The only indication in the record that the Defendant complained of any delay in the trial is an Amended Motion to Dismiss which was not filed until October 11, 1967. This is not sufficient under the above cases.

The Defendant complained that the Court committed fundamental and prejudicial error in permitting the witness, Curtis P. Harris, District Attorney, of Oklahoma County, to testify against the Defendant without having been first duly sworn as a witness; when Mr. Harris took the stand the Judge made the following comment:

"The Court: Mr. Harris, you are a member of the Bar, and it's not my policy to swear lawyers who testify in this Court. I expect them to testify on their oath as members of the Bar and I consider that to be a higher oath than the oath of a witness; therefore you'll be excused from being sworn. You may take the stand."

No objection to this procedure was made by the Defendant at the time and it is now raised for the first time.

The Defendant is also an Attorney and testified in his own behalf. The following exchange was had upon the Defendant's assuming the stand:

"The Court: Mr. Pitman, you are a member of the Bar, and I am going to accord you the same privilege of tes-

tifying without being sworn as a witness unless you request to be sworn."

"Mr. Pitman: No, Sir, I am a member of the Bar, and I realize those duties."

If anybody could complain in this instance it would be the State because it seems that the Judge places the testimony of Attorneys on a higher plane than other mortals and the Defendant is a lawyer. If the jury was prejudiced it was prejudiced in favor of this Defendant by this fact.

Regardless, we said in Keeney v. State, 53 Okl.Cr. 1, 6 P.2d 833, Section two of the syllabus:

"The right to have a witness sworn before testifying may be waived by a defendant and is waived where a defendant having knowledge that the witness has not been sworn, makes no objection until after verdict."

This case has been cited with approval by the United States Court of Appeals for the District of Columbia in Beausoliel v. United States, 71 App.D.C. 111, 107 F.2d 292 (1939).

We hold that the Defendant has waived his objection to this irregularity by not objecting at the time of trial.

As Proposition Seven of Defendant's Brief, he alleges that no proof was made that the Defendant testified to the statement alleged in the Information as false. This is apparently based on the assumption that the State failed to prove that the Defendant did in fact testify in Case No. 28808, in the District Court of Oklahoma County on February 2, 1965. The State produced the transcript of such hearing and the Defendant's Attorney stipulated that the Court Reporter did make the record and also waived any identification of the transcribed testimony of the Defendant.

The Defendant cannot now be heard to complain that the record of his earlier testimony was not accurately identified when such identification was waived at the trial.

The Defendant's Proposition Eight states that the Court erred in failing to sustain the Defendant's Demurrer to the evidence since the State offered only an unsworn statement to prove perjury and the falsity of a statement under oath cannot be proved by an unsworn statement of the Defendant and in support thereof cites Shoemaker v. State, 29 Okl.Cr. 184, 233 P. 489. In that case the Defendant was accused of perjury having testified in a Preliminary Hearing that a certain person had killed another while later at the trial of the accused person, she refused to identify the defendant as the killer. The State proved her contradictory testimony but failed to prove which testimony was false. We correctly held in that case that the general rule is that proof of contradictory statements under oath by an accused is not sufficient to convict of perjury. Oath nullifies oath, and it is incumbent on the State to prove the falsity of a statement on which the prosecution is based; but in such case the falsity may be proved by the evidence of one witness, or by circumstantial evidence. It may not be proved by additional unsworn statements of accused.

The Defendant would have us treat the Memorandum Agreement above referred to as an additional unsworn statement by the Defendant. We reject this contention. This is part of the extrinsic evidence required in the Shoemaker case and is independent proof of the falsity of the testimony that the Defendant made before Judge Fogg. Additional extrinsic evidence is the Deed from O'Neal back to Pitman in October, 1964.

As Proposition Nine, the Defendant alleges that the testimony he gave before Judge Fogg was not material to the issues involved in the hearing.

It will be recalled that the testimony was given in a hearing to Strengthen the Bond in the Garcia case and the property scheduled in the Bond had formerly belonged to Pitman's wife and was at the

time of the hearing in Pitman's name. There is no showing in the record that Judge Fogg knew that the property had been reconveyed to the Defendant by the Deed of October 12, 1964, nor did he know that the Deed had not been recorded until after the Application to Strengthen Bond had been made, but before the hearing was held. In deciding such a Proposition it is required that we assume that knowledge of these facts would have changed the Judge's ruling.

This Court said in Miles v. State, Okl. Cr., 268 P.2d 290:

"In People v. Pustau, 39 Cal.App.2d 407, 103 P.2d 224, 227, the California Court said:

'The test of materiality is met when it can be said that the testimony could have properly influenced the tribunal before which the case was being heard, upon the issues involved.'

"The false testimony herein was pertinent to the main issue though it did not bear directly on the main issue. In Coleman v. State, 6 Okl.Cr. 252, 118 P. 594, this court said on the point of materiality:

'(a) In order to constitute perjury, it is not necessary that the matter sworn to should be directly and immediately material, but it is sufficient if it is so connected with the matter at issue as to have a legitimate tendency to prove or disprove some fact that it is material by giving weight or probability to or detracting from testimony of a witness to such material fact.

'(b) Perjury may be assigned upon false statements affecting the creditability of a witness whose testimony was material to the main issue. For facts sustaining a charge for perjury under this head, see opinion.

'(c) Upon a trial for perjury, the degree of the materiality of the testimony upon which it is based is of no importance. Any false statement made by a witness which detracts from or adds weight and force to the testimony of any witness upon matters that are directly material thereby becomes material itself and constitutes perjury.'

"To the same effect is White v. State, 48 Okl.Cr. 387, 292 P. 369. On this point also see People v. Guasti, 110 Cal. App.2d 456, 243 P.2d 59."

We feel that the Defendant's testimony was in fact material to this hearing.

The Defendant complains in Proposition Ten that the Trial Court erred in failing to instruct the jury as to the purpose of the State's introduction of other offenses committed by the Defendant. This question is raised for the first time in the Defendant's Brief, and was not included in the Motion for new trial.

The Defendant's first witness was a fellow attorney, who testified that he had always found the Defendant to be honest and trustworthy and that his reputation in the community for truth and veracity was good. This, of course, puts the Defendant's good character at issue and the State can cross-examine the character witness or present witnesses of its own to refute character witnesses' testimony. Moore v. State, Okl.Cr., 374 P.2d 630. In cross-examining the Defendant, the State brought out the fact that the Defendant had been convicted of driving while under the influence of intoxicating liquors, and had been divorced on the grounds of adultery. It is better and safer practice where evidence of good character of the Defendant has been introduced to instruct the jury as to the same. See Morris v. Territory, 1 Okl.Cr. 617, 99 P. 760, 101 P. 111. However, we held in Vester v. State, 76 Okl.Cr. 235, 136 P.2d 205 as follows:

"Defendant complains that the court did not instruct the jury upon the question of good character. A number of witnesses testified as to the good character of the defendant. If defendant had requested the giving or had presented a written instruction to this effect, it would have been proper to give the same. It is not revealed that any such written

request was made. Defendant cites only the case of Morris v. Territory, 1 Okl. Cr. 617, 99 P. 760, 774, 101 P. 111. In that case a written requested instruction was presented. The same was denied and the case was affirmed. In the opinion, by Presiding Judge Furman, the court said: 'The evidence of the character of the defendant, both for and against him, was before the jury. They were correctly instructed that the presumption of innocence and the doctrine of reasonable doubt were applicable to all of the evidence in the case.

It would have been better for the court to have given an instruction upon character, embodying the views expressed by the Supreme Court of the United States in White's case (White v. United States, 164 U.S. 100, 17 S.Ct. 38, 41 L.Ed. 365), hereinbefore quoted and approved. In some cases, it might be reversible error to fail to give such an instruction; but our statute requires us to construe laws liberally and in the furtherance of justice, and forbids us from reversing a conviction upon a technical error or an exception that does not affect the substantial rights of the defendant. In this case we do not believe that an intelligent and honest jury could be found, who, with due regard for their oaths, and the testimony and the law, could ever come to any other conclusion than that the defendant was guilty of murder. Under the statute, above quoted, and after a consideration of the entire record, we are constrained to hold that in this case reversible error was not committed by failure of the court to instruct the jury upon the question of character.'

"In the annotation in Oklahoma Statutes Annotated, 1941, Title 22, Section 831, note 309, in quoting the case of Lumpkin v. State, 5 Okl.Cr. 488, 115 P. 478, it is said: 'Under subdivision 5 of this section, and section 856 of this title, the judge is required only to give and charge such matters of law as he thinks necessary for information of the jury in rendering their verdict, which

instructions must be settled after the introduction of evidence is concluded, and if counsel for accused desire additional instruction, they must reduce such instruction to writing and request that they be given, and a conviction will not be reversed where there is a failure to make such request, unless the Criminal Court of Appeals is of the opinion in the light of the entire record and instructions that, because of failure to instruct upon some material question of law, accused has been deprived of a substantial right.' Lee v. State, 67 Okl.Cr. 283, 94 P.2d 5; Green v. State, 70 Okl. Cr. 228, 105 P.2d 795; Pulliam v. State, 61 Okl.Cr. 18, 65 P.2d 426; not yet reported; Short v. State, 74 Okl.Cr. 272, 125 P.2d 227; Adams v. State, 62 Okl. Cr. 167, 70 P.2d 821.

"In the instant case, the court instructed the jury upon the question of reasonable doubt, and upon the presumption of innocence, and under the facts, as above stated, we are of the opinion that it was not error for the court to fail to give an instruction as to the good character of the defendant, when the same was not requested by counsel for defendant."

In this case, we do not feel that the failure to give an instruction on this point is reversible error.

■ The Defendant's last Proposition states that during the trial and closing arguments, the State made prejudicial statements which substantially affected the Defendant's right to a fair trial.

We have read the entire Casemade, including the closing arguments of counsel and do not agree with Defendant's contention. As a matter of fact, the argument of defense in closing the case was at points somewhat beyond the bounds of propriety. Although this case was tried only one time the Defendant's lawyer stated to the jury that they were the third jury that had tried this case and that they had never convicted him. He also stated that the minute the jury convicted the Defendant he would be automatically disbarred for the rest of

his life from the practice of law. In spite of these statements the jury found the Defendant guilty.

In a separate Motion to Dismiss the Defendant raises to issue the doctrines of collateral estoppel and res judicata and in support argues that the fact question in this case was decided in O'Neal v. State, Okl.Cr., 468 P.2d 59. In that case E. W. O'Neal was convicted in the District Court of Oklahoma County of perjury by falsely swearing under oath that he was the owner of Block 3, Artesian Springs Second Addition to Oklahoma City, State of Oklahoma. This Court at first affirmed this conviction but on rehearing withdrew the original opinion and promulgated the opinion found at the above citation.

While it may be true that the same parties need not be involved to invoke the doctrine of collateral estoppel it is surely required that the fact question be the same. In the O'Neal case his false statement was alleged to have been made in a justification on a bond made on January 8, 1964, wherein the above described property was scheduled. In this case, the defendant's alleged false statement was to the effect that O'Neal owned entirely different land and that it was his to do with as he wished with nothing in return. The fact question in this case was not litigated in the O'Neal case and we, therefore, reject this argument.

Judgment affirmed.

MILLER, Special Judge, concurs.

BRETT, P. J., dissents.

BRETT, Presiding Judge (dissents).

As Presiding Judge of the Court for this appeal, I take this opportunity to express my thanks and appreciation for the assistance of the Honorable John R. Carle, and the Honorable James B. Miller, in bringing this matter to a conclusion. Notwithstanding, I must respectfully dissent to their majority opinion concerning this appeal.

Plaintiff in Error, Valdhe F. Pitman, was convicted in the District Court of Oklahoma County on October 19, 1967, for the crime of Perjury. He was tried by a jury which returned a verdict of guilty, and assessed his punishment at one (1) year under the direction and control of the State Department of Corrections. Judgment and sentence was imposed on November 2, 1967, and was suspended by the trial judge. Plaintiff in error, hereinafter referred to as defendant, perfected this appeal.

The facts briefly related are: Defendant is an attorney who entered a written "Memorandum Agreement" establishing a bail bond business with one, E. W. "Jeep" O'Neal. In the fourth paragraph of the agreement the following statement appears:

"* * *, it being understood and agreed that the properties used on said bonds are the properties of first party [defendant] and are held in trust by second party [O'Neal]."

In the fulfillment of the agreement, defendant transferred several pieces of real property to O'Neal; however, the first quit-claim deed describing Lots 29 and 30, Block 1, Bancroft Addition to Oklahoma City, Oklahoma, dated August 21, 1963, conveyed nothing to O'Neal, for the reasons that title to the property was vested in Paula J. Wilde, at that time Paula J. Pitman, defendant's wife.

On August 27, 1963, O'Neal signed as surety on Freddie Garcia's One Thousand ($1,000.00) Dollar bail bond and listed the Bancroft Property as security. September 3, 1963, seven days later, defendant and his wife jointly executed a quit-claim deed to the same Bancroft Property, conveying the tract to O'Neal. That deed was recorded September 25, 1963. Another quit-claim deed to the Bancroft Property was produced by the prosecution dated October 12, 1964, conveying the property from O'Neal back to defendant. The date this deed was delivered to defendant was not shown to be other than asserted by defendant, as being delivered to him just

prior to its being recorded. This deed was recorded January 15, 1965.

On January 4, 1965, the District Attorney for Oklahoma County filed over one hundred Applications to Strengthen Bail Bonds, among which was the bond of Freddie Garcia listing the Bancroft Property as security. The number of applications filed was so numerous that the prosecutor duplicated a format for his applications and filled in the pertinent information for each application. On February 2, 1965, a hearing was had on some of those applications before the late Judge William L. Fogg. Unexpectedly defendant was called upon by the prosecutor to testify concerning the Garcia bond and the Bancroft Property.

This charge is premised upon the answers defendant gave in reply to certain questions asked by the Honorable Judge, as follows:

COURT: "What do you know about the property? Referring to the Bancroft Property.

WITNESS: "That is one of the pieces of property, Your Honor, that I signed over to Mr. O'Neal, without any deed or anything for return. It was his property to do with as he saw fit, anyway he saw fit, that just happens to be a duplex apartment house, and five room house on both of these."

COURT: "So, based upon your knowledge, did Mr. O'Neal own that property at the time that bond was given?"

WITNESS: "Yes, he certainly did."

Defendant was charged with the offense of perjury under 21 O.S.1961, § 491, which reads as follows:

"Every person who having taken an oath that he will testify, declare, depose or certify truly before any competent tribunal, officer, or person, in any of the cases in which such an oath may by law be administered, wilfully and contrary to such oath, states any material matter which he knows to be false, is guilty of perjury."

The State produced seven witnesses to prove this charge. Mr. W. H. Reigan a Deputy Court Clerk identified various items which had been filed in the Court Clerk's Office. Mr. Aubrey Crisp, a Certified Court Reporter, was called to identify the transcript of evidence which he recorded at the hearing to strengthen bail bonds on February 2, 1965, out of which this charge arose. The defense stipulated that the witness was the court reporter who reported the hearing; that the transcript was a true and correct copy—identified as State's Exhibit No. 8—and over defendant's objections, pages 49 and 50 were admitted into evidence. It was that portion of defendant's alleged testimony upon which this charge was premised.

The third witness was Mr. Curtis Harris, the Chief Prosecutor, who became a witness to identify a copy of the original Application to Strengthen Bonds, because the original filed in the Court Clerk's Office could not be located; however, before the trial ended, the original was located. Mr. Harris related, that he dictated the application; filed it and "way over a hundred" others; and that he conducted the hearing had before Judge Fogg. The Assistant Prosecutor asked Mr. Harris: "And in connection with strengthening the bonds, what importance, if any, did those questions that were asked on pages 49 and 50, have to do with the hearing that was taking place?" Mr. Harris answered: "To determine if the property listed on the bonds and the person who signed the bond owned that property, and to determine if a bond was sufficient, and the person who signed the bonds, and the bond, whether or not they were—met the qualifications to sign such a bond." Defendant's objections to the answer was sustained. The witness testified further that he was present at O'Neal's trial[1] and heard the testimony given by defendant at that trial.

---

1. O'Neal v. State, Okl.Cr., 468 P.2d 59 (1970).

Mrs. Ruby Jewell Rodgers was the fourth witness. She had been defendant's secretary and witnessed the Memorandum Agreement (State's Exhibit No. 10) when it was executed; and she stated she was the Notary Public for the execution of the quit-claim deed to O'Neal signed by defendant and his wife. That deed was admitted as State's Exhibit No. 12. The fifth witness was Mr. Bryan Beatty, Deputy Clerk in the County Clerk's Office, who identified State's Exhibits Nos. 11, 12, and 13, as being true copies of the quit-claim deeds on file in the County Clerk's Office. He also identified the photostatic copy of the warranty deed which conveyed the Bancroft Property to Paula J. Wilde, Exhibit No. 14. He testified also that the Memorandum Agreement could not be filed of record, because the signatures had not been acknowledged by a Notary Public.

Mr. Harvey Dowdy, Assistant Manager of the Bookkeeping Department at Liberty National Bank was the sixth witness. He identified the bank account established for the bail bond business and certain instruments which passed through his bank. The last witness was Mary O'Leary, the Court Reporter for District Judge Clarence Mills. She identified the transcript of defendant's testimony given at E. W. "Jeep" O'Neal's trial on October 25, 1965, introduced as Exhibit No. 62, over defendant's objections. The State then introduced Exhibits numbered 15 through 22, which were other bail bonds on which O'Neal had listed the Bancroft Property as security. These exhibits were admitted over defendant's objections.

Defendant demurred to the evidence asserting that the State had failed to prove the material elements of the charge contained in the information; and that the State failed to prove any corrupt intent, or that the statements of defendant were made with the knowledge that they were false. The demurrer was overruled and defendant set forth his defense for the jury. Defendant's demurrer should have been sustained, as I view the record.

When defendant rested his case, the prosecutor was called a second time to testify. He was qualified as an expert in title examination, and was asked by his Assistant Prosecutor:

"Now in your examination of titles, if any instrument such as State's Exhibit No. 10, which has been introduced in evidence, *had been filed of record* in a county against a particular person and naming those persons, *as in this case,* Valdhe F. Pitman, and E. W. O'Neal, and this instrument *had appeared of record* wherein its stated purpose that the properties used on the bonds that were to be made by Mr. O'Neal are held in trust by Mr. O'Neal for Valdhe F. Pitman, if you had been examining a piece of property along those lines, would you have approved the title as far as being owned by E. W. O'Neal." (Emphasis added)

The witness answered:

"I would not."

He then went on to state in answer to the next question that O'Neal was not entitled to list the Bancroft Property on the bond. Even though defendant failed to object to the question, it is of such fundamental nature, being premised upon a false basis, intended to mislead the jury, the complaint now is not waived. The State's own witness testified that the agreement could not be recorded, because the signatures were not acknowledged. See: 16 O.S.1961, § 26.[2]

## I.

On January 20, 1971, when this case was reargued, defendant asserted: That the elements of the crime of perjury were not proved; and that this Court had held the

---

**2.** "No deed, mortgage or other instrument affecting the real estate, shall be received for record or recorded unless executed and acknowledged in substantial compliance with this chapter; and the recording of any such instrument not so executed and acknowledged shall not be effective for any purpose." R.L.1910, § 1169.

charge of perjury requires proof of two witnesses that the alleged statement was not true, or with one witness supported by sufficient circumstantial evidence. To support this contention he cited, Cameron v. State, Okl.Cr., 365 P.2d 576, 588 (1961), wherein this Court said the following:

> "The rule concerning evidence necessary to sustain a conviction for perjury is stated in Wharton's Criminal Evidence, 12th Ed., Vol. 3, § 956, n. 397 thusly:
>
>> 'It is generally held that to sustain a conviction for perjury there must be the testimony of two witnesses, or the testimony of one witness which is corroborated by other circumstances. * *
>>
>> 'The corroborating evidence in perjury prosecutions must be clear, positive, and strong, so that, in connection with the evidence of the witness who testifies directly, it will convince the jury beyond a reasonable doubt.
>>
>> 'The corroboration must go beyond slight and indifferent particulars. It must tend to show the statements alleged to have been falsely sworn. Corroboration is required for the false testimony as a whole, but not for every constituent element of it. If the falsity of the defendant's statement is proved beyond a reasonable doubt, there is sufficient ground to sustain a conviction.'"

As I review the record before this Court, defendant's contention is well taken. None of the witnesses testified that the defendant's statement was false; nor were circumstances sufficient to corroborate one witness had such testimony been offered. The prosecutor testified that the purpose for filing the applications to strengthen bonds was: To determine if the property listed on the bonds was owned by the person who signed it; to determine if the bond was sufficient; and whether or not the signer of the bonds met those qualifications.

## II.

Referring to the Bancroft Property, and the questions raised by the prosecutor, I find that O'Neal did meet those requirements to list the property on bail bonds. Notwithstanding the fact that the first quit-claim deed conveyed nothing to O'Neal, the quit-claim deed executed by defendant and his wife, seven days after the Garcia bail bond was posted, corrected that deficiency, by operation of law. Title 16 O.S.1961, § 17 is the Statute setting forth the after-acquired title provisions which became applicable, under the circumstances involved herein.[3]

Under ordinary circumstances those provisions may not apply to quit-claim deeds; however, under these circumstances the rule is made applicable, i. e., when the intent to convey is clear on the face of the deed; when the grantee expects to receive conveyance; and when the instrument contains sufficient words to convey title.[4] See: Callahan v. Stewart, 231 F. Supp. 115, 121, (D.C.Okl.1964)

it is now generally held that if a deed, either expressly or by necessary implication, shows that the grantor intended to convey, and that the grantee expected to acquire, an estate of a particular kind, the deed is a foundation for the doctrine, even if it contains no technical covenants whatever. Several Legislatures have made a statutory statement of the doctrine in still broader terms to the effect that, whenever a deed purports to convey a greater estate than the grantor owns, any after-acquired interest of such grantor, to the extent of that which the deed purports to convey, inures to the benefit of the grantee. The effect of such stat-

3. That statute reads: "All rights of a mortgagor or grantor in and to the premises described in the instrument and existing at the time or subsequently accruing, shall accrue to the benefit of the mortgagee or grantee, and be covered by his mortgage or conveyed by his deed, as the case may be."

4. Patton On Titles, (2d Ed. 1957) Vol. 1, § 216, p. 512 states:
"* * * At common law the doctrine applied only to conveyances which contained a covenant of warranty. Now, however, any of the title covenants may produce the necessary estoppel. In fact,

All of the quit-claim deeds were executed on "Manley Legal Form No. 280 AF" which contain sufficient words of conveyance to transfer title, i. e., "quit-claim, grant, bargain, sell and convey."

Consequently, I find that the validity of the Bancroft Property pledged on the Garcia bond was sufficient; and it was likewise sufficient at the time of the hearing on the prosecutor's applications to strengthen bail, notwithstanding the quit-claim deed from O'Neal to defendant, which was recorded on January 15, 1965. It was brought out by Judge Miller, when this matter was reargued before this Court, that the pledge of the Bancroft Property was in furtherance of the purpose of the memorandum agreement; and therefore, defendant would be estopped from subsequently denying any lien against the property as the result of bond foreclosure and judgment.

### III.

In his brief, defendant asserts that the State failed to prove that defendant was administered an oath by one authorized to do so, at the hearing on the prosecutor's applications. To support this contention he cites Dunkin v. State, 53 Okl.Cr. 115, 7 P.2d 912 (1932), wherein this Court recited:

"One of the important things to be established where a defendant is being tried on a charge of perjury is that an oath was administered, and the false testimony given by the defendant under oath, and that the oath was administered by some officer having authority to administer the oath." [21 O.S.1961, § 491; R.L.1910, § 2211]

utes, so far as after-acquired title is concerned, is to read into all deeds, purporting to convey a fee title, full covenants of warranty. Usually, therefore, they bring conveyances by quit-claim deed within the operation of the rule, though this is not always the case.

* * * But the rule does apply if the deed bears upon its face evidence that the grantor intended to convey, and the

In *Dunkin, supra,* the Court stated that the conviction was reversed because, "There is no testimony showing that the defendant in this case was sworn before he gave testimony in the case. * * *" An examination of the record before this Court reflects that there is absolutely no showing whatsoever that defendant was administered an oath, prior to giving his testimony. The burden is upon the State to prove all the elements of the crime. It is not sufficient to presume that whatever is required to be done, was done. See: Phillips v. State, Okl.Cr., 483 P.2d 1386 (1971).

Also, in Smith v. United States, 363 F.2d 143 (C.A. 5th Cir. 1966), under a Federal Statute essentially the same as the Oklahoma Statute, the United States Court of Appeals held it to be reversible error, when the prosecution failed to prove that an oath was administered to the witness, by one authorized to administer such oath. In that case the transcript of defendant's testimony in the District Court was introduced to prove that he had testified falsely. The court stated, with reference to the reporter's prefatory statement reciting that the witness was duly sworn:

"The bare statement, 'Petitioner, Joe Smith, having been duly sworn, testified as follows * * *,' does not even purport to be a transcription of the prior proceedings, but is rather a mere *ex parte,* unsworn conclusion by the reporter that appellant had been sworn." (Emphasis not added)

In the record before this Court, not even the reporter's prefatory statement is included. Instead, the alleged testimony is offered without any reference being made whatsoever that the witness was administered an oath, or even admonished

grantee expected to receive, an estate of a particular character—under such circumstances, the grantor and those claiming under him will be as effectively estopped to assert an after-acquired title to the extent of the estate embraced in the conveyance as would be the case if a formal covenant to that effect had been inserted."

that his testimony was being accepted on his oath as an attorney. The prosecutor merely offers the alleged testimony, without attempting to prove the essential element of the crime. The stipulation provided that the transcript was recorded by Mr. Aubrey Crisp, the Court Reporter, but nothing refers to the administration of an oath.

The definition of "testimony" recited in the majority opinion taken from Patterson v. State, 122 Ohio St. 96, 171 N.E. 26 (1930), pertained to testimony given at a Grand Jury hearing. On page 26 of the report the following appears:

"The transcript of Patterson's testimony showed that he was 'called as a witness' before the grand jury, and 'duly sworn'. * * *" (Emphasis added)

However, nowhere in the record before this Court is there anything to even show that defendant was *duly sworn*, let alone proof of the same.

The definition of "testimony" in the majority opinion taken from Wyoming Loan and Trust Company v. W. H. Holliday Company, 3 Wyo. 386, 24 P. 193 (1890), was provided in a civil case concerning an action to recover a certain sum of money in 1890. The appeal presented a question pertaining to the overruling of a motion for new trial. The definition of the word "testimony" was offered to distinguish it from the word "evidence". While the definition is correct, *it is not sufficient to constitute proof required in a charge of perjury.*

In a criminal trial all the elements of the offense must be proved. In this case the information charged that the testimony was given *under oath;* consequently proof of the oath is an element of the offense and should be proved beyond a reasonable doubt, and should not be left to conjecture, or belief. In Smith v. United States, *supra,* the Court of Appeals stated with reference to proof of the charge of perjury:

"The error below, manifest upon the record, was the *failure to prove an essen-tial element of the crime of perjury*—that is, *that the accused took an oath required by law."*

Had the defendant in the instant case been a confirmed criminal, this appeal would have been reversed on that single proposition, as the Court of Appeals did in Smith v. United States, *supra.* It is this writer's belief, that a member of the Bar Association is entitled to receive, at least, equal consideration and equal protection of the law as that afforded the confirmed criminal.

## IV.

If for no other reason, this conviction is subject to reversal because of the denial of defendant's right to fundamental fairness guaranteed by due process of law, as the result of the multiple role played by the prosecutor in defendant's trial. Had Mr. Harris been the single prosecutor in his office, there might be some reasonable explanation for his action, but such is not the case. Considering also that he had at his side during the entire trial his first assistant, who is a most competent and capable prosecutor. Consequently, as I view the trial, it was not necessary; or required by circumstances; nor was it proper that he testify and conduct the defendant's trial as was done.

After he filed the information charging the offense of perjury, the prosecutor performed the following:

1. He testified "in chief" as a witness for the prosecution.

2. He became a "rebuttal witness" and was qualified as an expert witness, testifying on the basis of a false hypothetical proposition.

3. He interrogated all the witnesses but two, himself and Mr. Harvey Dowdy.

4. He made the closing argument for the State, when the case was submitted to the jury.

In Clark v. State, Okl.Cr. 370 P.2d 46 (1962), this Court stated; "that circum-

stances must be extraordinary for the prosecutor to become a competent witness." I fail to find those extraordinary circumstances in this case.

In Robinson v. United States, 32 F.2d 505, 66 A.L.R. 468 (C.A. 8th Cir. 1929), the United States Court of Appeals stated in part:

"* * * [T]he practice of acting as prosecutor and witness is not to be approved, and should not be indulged in, except under most extraordinary circumstances."

In Adams v. State, 202 Miss. 68, 30 So.2d 593 (1947), the prosecutor was disqualified from testifying. In Jenkins v. State ex rel. Sweat, 242 Miss. 646, 136 So.2d 580 (1962), the prosecutor was not considered qualified to testify. See also: Bennett v. Commonwealth, 234 Ky. 333, 28 S.W.2d 24 (1930); and Frank v. State, 150 Neb. 745, 35 N.W.2d 816 (1949). The practice is held to be improper in the ABA Code of Professional Responsibility, and the Oklahoma Bar Association, Canons of Ethics,[5] as well as in the Oklahoma Bar Association Advisory Opinions Numbers 9 and 114. In the Oklahoma Bar Association Advisory Opinion No. 9 of October 30, 1931, the syllabus recites:

"It constitutes unprofessional conduct for a county attorney or his assistant to testify as a witness for the state in a criminal case wherein they appear as counsel for the state, except as to merely formal matters."

Also, in the Oklahoma Bar Association Advisory Opinion No. 114 of September 25, 1936, the second paragraph of the syllabus states:

"No member of the bar having a just conception of his true and proper posi-

tion will unite the character of counsel and witness in the same case."

In the body of that opinion the following is found:

"The language of the Supreme Court of Minnesota in Ferraro v. Taylor, 197 Minn. 5, 265 N.W. 829 is apposite:

'The practice of attorneys of furnishing from their own lips and on their own oath the controlling testimony for their client is one not to be condoned by judicial silence * * * The good name and deservedly high standing of the * * * bar requires that the practice be stopped, for nothing short of actual corruption can more surely discredit the profession.' "

When the appeal was reargued before this Court, the prosecutor was asked if he considered defendant's trial met the requirements of fundamental fairness set forth by the United States Supreme Court, especially insofar as he testified twice and continued to serve as chief prosecutor throughout the trial. The prosecutor answered that he did consider those requirements were met and added, *that he did not know that it would be necessary for him to be a witness and testify.* But, counsel for defendant produced a copy of the Information filed in this case, which showed that the prosecutor was endorsed on the Information as one of the witnesses for the State.

Consequently, considering that almost two years had passed since the Garcia Bond was signed and the circumstances which existed at the time defendant testified before Judge Fogg, I believe Mr. Pitman possessed no more intent to testify falsely before Judge Fogg, than the prosecutor intended to testify falsely on January 20, 1971, before the three Judges of this Court.

---

5. American Bar Association Special Committee on Evaluation of Ethical Standards, Code of Professional Responsibility, "Ethical Consideration" EC 5–9, p. 59; "Disciplinary Rule," DR 5–102, [eff. Jan. 1, 1970]. "Canons, Professional Ethics," 5 O.S.1961, Ch. 1, App. 3, Canon 19, p.

138 [adopted Oct. 6, 1958]. ABA Canons of Professional Ethics adopted by the Oklahoma State Supreme Court on "Rules Creating and Controlling the Oklahoma Bar Association," 41 O.B.J. 180, 188.

Defendant had transferred title to O'Neal for the purpose of listing the properties on bail bonds and O'Neal was sufficiently vested with title to the Bancroft Property to have transferred clear title to that property to an innocent third party, because the quit-claim deed was silent concerning the memorandum agreement.[6] Whether or not the Bancroft Property could have been disposed of by sale, in which instance the trustee could have retained the proceeds of sale in trust, the agreement does not provide, and that question is not before this Court; nonetheless, by the terms of the agreement O'Neal possessed the full power of a trustee; and he was possessed of full title to the Bancroft Property, even though as trustee.

And lastly, I believe the manner in which the prosecution used defendant's earlier *uncontested divorce,* which was granted on the grounds of adultery because of his wife's religious convictions, was "unfairly" done. Defendant was cut-off by the court when he tried to explain the divorce action. Likewise, defendant should have been permitted to explain the circumstances of a misdemeanor conviction for drunk driving, sustained when he was a college student, but he was not permitted to do so. Both matters were allegedly entered into for the purpose of challenging defendant's moral character. In People v. Matthews, 33 A.D.2d 679, 305 N.Y.S.2d 919, S.Ct.App.Div. 1st Div., the New York Court recited:

> "We reiterate that it is as much the function of the prosecutor as it is of the court to assure a fair trial to a defendant. 'Even in cases of clearest guilt * * * it is the duty of the district attorney to refrain from over-zealous advocacy. (People v. Slover, 232 N.Y. 264, 267, 133 N.E. 633, 634.)'."

As I view the record, all of these violations of fundamental fairness precluded the defendant from receiving a fair trial in accordance with due process of law, guaranteed by the Constitution of the United States, and the Constitution of the State of Oklahoma. The proper administration of justice demands that appellate review treat fundamental questions, when prejudice is caused the defendant. The least this defendant is entitled to receive is a new trial.

I respect the views of my fellow judges in this matter, but I also feel compelled to state my view of this appeal in detail. Appellate review is not so much concerned with the innocence or guilt of the one convicted, as it is with whether or not the defendant's constitutional rights were protected; and whether or not he received a fair trial according to due process of law. I would reverse and remand this conviction, for the reasons stated.

---

6. See: 60 O.S.1961, § 156, and § 175.7.